# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| TERESA SYKES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Case number 4:06cv1732 TCM |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security,[1] | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security ("Commissioner"), denying the application of Teresa Sykes for supplemental security income benefits ("SSI") under Title XVI of the Social Security Act ("the Act") the Act, 42 U.S.C. §§ 1381-1383b, is before the Court, see 28 U.S.C. § 636(c), for a final disposition. Ms. Sykes has filed a brief in support of her complaint; the Commissioner has filed a brief in support of his answer.

## Procedural History

In March 2002, Plaintiff applied for SSI, alleging a disability as of May 15, 2001,[2] caused by low back pain, degenerative disc disease, left sciatic problems, and mental illness.

---

[1]Mr. Astrue was sworn in as the Commissioner of Social Security after this action was filed and is hereby substituted as defendant pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

[2]A prior application for SSI had been denied on May 14, 2001, by Administrative Law Judge Thomas C. Muldoon. (Id. at 73-79, 163.)

(R.[3] at 88, 135-37.)  This application was denied initially and after a hearing held in June 2003 before Administrative Law Judge ("ALJ") Thomas C. Muldoon.  (Id. at 38-57, 85, 88-92, 102-15.)  The Appeals Council remanded to the ALJ with directions to resolve contradictory findings about Plaintiff's mental impairments, obtain updated medical records, and, if necessary, elicit testimony by a vocational expert.  (Id. at 119-22.)  Included in the order of remand were directions to obtain a consultative examination if the additional medical evidence did not clearly depict Plaintiff's limitations.  (Id. at 121.)

Following a supplemental hearing in April 2004 before ALJ Muldoon, Plaintiff's SSI application was again denied.  (Id. at 19-25, 58-69.)  After receiving the claim file relating to Plaintiff's June 2005 application, the Appeals Council denied review, effectively adopting the decision of the ALJ as the Commissioner's final decision.  (Id. at 7-10.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, and Clifton Franklin testified at the 2003 administrative hearing.

Plaintiff testified that she was single and lives in a house with her two sons, then ages 14 and 10.  (Id. at 41.)  She was 5 feet 2 inches tall and weighed 187 pounds.  (Id. at 42.)  Her normal weight was 167 pounds.  (Id.)  She had completed the twelfth grade, had a certificate in business office technology, and had last worked in 1998 as an office assistant

---

[3]References to "R." are to the administrative record filed by the Commissioner with his answer.

for an electrical company.  (Id.)  She was fired because she injured her back at work.  (Id. at 43, 54.)  Her two jobs before that were casual or part-time.  (Id. at 43-44.)

Plaintiff drove only short distances because she was concerned that her back would start hurting.  (Id. at 44.)

Plaintiff further testified that she had pain in her lower back and in her left leg.  (Id. at 45.)  The latter sometimes shifted to the right leg.  (Id.)  The pain was constant.  (Id.)  She treated it with medication, a transcutaneous electrical nerve stimulation ("TENS") unit, a back brace, sitz baths, home exercises, physical therapy, and pain management.  (Id.)  Dr. Hook prescribed the TENS unit.  (Id. at 47.)  Steroid injections helped relieve the pain temporarily.  (Id.)  Also, she had constant headaches.  (Id. at 47-48.)  Her medications caused constipation, nausea, and abdominal pains; she took another medication to relieve those side effects.  (Id. at 48.)

The pain caused Plaintiff to be sad and to have difficulty sleeping.  (Id. at 49.)  She got two or three hours of sleep a night.  (Id.)  She did floor exercises to help her get back to sleep and took Trazodone, which helped until her body became immune to it.  (Id. at 49-50.)  She had not been back to her doctor to tell him about the Trazodone.  (Id. at 50.)

Her energy level was low and her ability to concentrate was poor.  (Id.)  She spent her day laying down and reading the Bible.  (Id. at 50-51.)  The only housework she was able to do was the dishes.  (Id. at 51.)  Her boyfriend, Clifton Franklin, or her sons did the other chores.  (Id. at 52.)  Plaintiff testified that she could sit for only 30 minutes, stand for 30 to

60 minutes, and walk for 60 minutes. (Id.) She could not climb stairs. (Id.) She could lift no more than 10 to 15 pounds. (Id. at 53.) She could not stoop or crouch. (Id.)

Mr. Franklin testified that he is Plaintiff's boyfriend and the father of her sons. (Id. at 55.) He had seen Plaintiff change during the past five years and testified that her pain caused her not to want to do anything. (Id.)

Plaintiff, again represented by counsel, was the only witness to testify at the 2004 hearing.

She was born on April 7, 1969, and was then 35 years old. (Id. at 61.) She thought she was 5 feet 5 inches tall and she weighed 176 pounds. (Id.) She had not worked since the last hearing. (Id. at 62.) She was being treated at the Pain Management Center for her back pain. (Id. at 63.) She had had three nerve blocks that year, with the last being on April 20. (Id.) The relief from the injections was temporary. (Id.) Beginning in May, she was going to be in physical therapy. (Id. at 64.) She had gone to physical therapy the previous summer and it had helped "somewhat." (Id.)

Plaintiff described her worst pain as the pain in lower back. (Id.) This pain was constant, severe, and radiated to her left ankle. (Id. at 64-65.) The pain caused her to be confused and to have difficulty concentrating. (Id. at 65-66.) She saw a psychiatrist, Dr. Ahmad, once a month and had been doing so for three years. (Id. at 66.) He has prescribed Trazodone, Effexor, and Xanax – none help her sleep. (Id. at 66-67.)

Her sons did the housework, including the laundry; her family helped with the grocery shopping.  (Id. at 67-68.)  Because of her pain, she did not have any hobbies and had no social life.  (Id. at 68.)

### Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to her application, records from various health care providers, and evaluations from treating physicians and non-examining consultants.

Plaintiff completed a Disability Report in March 2002.  (Id. at 153-62.)  She listed both June 1, 1998, and March 7, 2002, as the date when her illnesses first bothered her and August 10, 1998, and August 7, 2002, as two dates when the illnesses prevented her from working.  (Id. at 154.)  She stopped working on August 10, 1998.  (Id.)  She listed two reasons: she was laid off and she was fired because she could no longer preform her duties. (Id.)

On a separate, claimant questionnaire, completed in May 2002, Plaintiff reported that she had chronic lower left leg sciatica and that sometimes the pain shifted to the right side of her leg and back.  (Id. at 167.)  The pain was caused and aggravated by stress, climbing, changes in weather, and sitting, standing, or walking for too long.  (Id.)  She had attempted various remedies to relieve her pain, including trigger point injections, stretches, acupuncture, and applying heating pads.  (Id.)  She took several prescription medications, which had side effects of constipation, dry mouth, upset stomach, and nightmares.  (Id.)  Her

pain affected her ability to mop and sweep the floors of her house and to wash the walls. (<u>Id.</u> at 168.) She would wake up in the middle of the night with back spasms and would do stretches to try to go back to sleep. (<u>Id.</u>) She wore loose-fitting clothes and prepared microwave meals. (<u>Id.</u>) She had difficulty sometimes following directions if no one was with her. (<u>Id.</u>) Her children helped her shop. (<u>Id.</u>) She could do the dishes and fold her clothes; her sons had to do the rest of the household chores. (<u>Id.</u>) She read the Bible and drove her sons to school or to do the grocery shopping. (<u>Id.</u> at 169.) She left her house only when necessary, and this included visiting her mother. (<u>Id.</u>) Her pain prevented other activities such as attending church or participating in social groups. (<u>Id.</u> at 170.)

Plaintiff listed four jobs on a Work History Report. (<u>Id.</u> at 172-79.) The job she had held the longest was as a receptionist for the electrical company. (<u>Id.</u> at 172.) She had worked for the company, Graybar Electric, from February 1997 to August 1998. (<u>Id.</u>) This job required that she walk for a total of four hours of each eight hour work-day, stand for the same period of time, sit for up to four hours, and climb for one to two hours. (<u>Id.</u> at 175.) The heaviest weight she lifted frequently was twenty-five pounds. (<u>Id.</u>) The next longest-held job lasted eight months in 1996. (<u>Id.</u> at 172.)

On a form completed in June 2002, Plaintiff listed seven medications she was taking: Tofranil, Celexa, Xanax, Topamax, Ultram, Napronex, and Soma. (<u>Id.</u> at 184.) The first four were prescribed by Dr. Aqeeb Ahmad; the next three were prescribed by Dr. Das. (<u>Id.</u>) On a form submitted at one of the hearings, Plaintiff listed current medications of Hydrocodone, Effexor, Trazodone, Naproxen, Topamax, and Alprazolam. (<u>Id.</u> at 193.)

Plaintiff had earned income in nine of the nineteen years between 1985 and 2003, inclusive. (Id. at 148.) In three of those years – 1985, 1986, and 1989 – her annual income did not exceed $650. (Id.) In three of those years – 1991, 1995, and 1996 – her annual income was greater than $650 but less than $2,000. (Id.) In 1992, her annual income was $3,046.55; in 1997, it was $17,120.63; and in 1998, it was $11,588.10. (Id.) She had no income after 1998. (Id.)

The medical records before the ALJ begin in the fall of 2000 and are summarized below.

On September 18, 2000, Plaintiff reported to Mary Ann Sweeney, F.N.P. with the Family Care Health Centers ("FCHC") that the orthopedic clinic at St. Louis University had refused to treat her back pain because she had a disability application pending. (Id. at 199.) She complained of severe pain that was not relieved by the medications she was on, Robaxin, Naprosyn, and Ultram. (Id.) The pain radiated down her left leg to her heel and down her right leg to her thigh. (Id.) On examination, she had lower back pain with abduction and adduction and had some straight leg pain. (Id.) "She seem[ed] to have a lot of pain no matter what she [did]." (Id.) Her reflexes were normal; her strength was "fairly equal," with the exception of a slight decrease on her left side. (Id.) She was continued on her present medications and was to be scheduled for either a magnetic resonance imaging ("MRI") or for an appointment with another orthopedist. (Id.)

In June, Plaintiff consulted Ms. Sweeney about lower abdominal pain and diarrhea that had begun three or four days before. (Id. at 324.) Two weeks later, she returned after

she had been to the emergency room for a urinary tract infection.  (Id. at 325.)  She also complained of low back pain.  (Id.)

Plaintiff was seen on March 19, 2001, by Ajit Nagra, M.D., with the Barnes-Jewish Hospital Pain Management Center ("the Center").  (Id. at 216-21.)  He noted that a recent MRI of her back had shown "no abnormality except for mild degenerative disc disease at the L5-S1 level with no disc herniation or stenosis."  (Id. at 216.)  She complained of back pain that had begun immediately after a fall two and one-half years before.  (Id. at 216, 218.)  On her left side, the pain radiated down her leg to her ankle; on her right side, the pain radiated down her leg to her calf.  (Id.)  The pain was "constant, nagging, aching" and was better when she lay on her side with her knees flexed.  (Id.)  At the time of her visit, the pain was an eight to nine on a ten-point scale, with ten being the worst; at its least, it was a five.  (Id. at 216.)  On examination, Plaintiff was in "mild to moderate distress, secondary to her back pain."  (Id.)  There was no clubbing, cyanosis, edema, or jaundice.  (Id. at 216, 221.)  Her motor strength was 4/5.  (Id.)  Straight leg raising was negative for any radiculopathy.  (Id.)  There was, however, marked tenderness in her lumbar area, worse on the right side than on the left.  (Id.)

Dr. Nagra opined that Plaintiff had myofascial pain in the paravertebral lumbar area; trigger points in the right paravertebral muscles; depression; insomnia; and obesity.  (Id.)  She was given trigger point injections, was referred to physical therapy, and was encouraged to lose weight.  (Id. at 216-17.)

Ten days later, Plaintiff saw Dr. Ahmad for her depression.  (Id. at 240-42.)  She explained that she had had chronic lower back pain since falling in 1998.  (Id. at 240.)  She was experiencing panic attacks, was feeling socially isolated, did not want to leave her house, and was not sleeping well.  (Id.)  She complained of memory loss.  (Id.)  She was diagnosed with major depression and possible panic attacks and opiate addiction.  (Id. at 242.)  She was also prescribed three medications.  (Id.)  Her Global Assessment of Functioning[4] ("GAF") score was 50.[5]  (Id.)

Plaintiff returned to Dr. Ahmad on April 12.  (Id. at 243.)  She reported a slight improvement in her depression, and no improvement in her back pain.  (Id.)  Her dosages of two medications were increased.  (Id.)  Her GAF was 51.[6]  (Id.)

When Plaintiff saw Dr. Nagra the next week she reported that the pain in her lower back was unchanged.  (Id. at 222.)  She also reported that it was currently a seven.  (Id.)  Her constipation was better, but her mouth was dry.  (Id.)  She started physical therapy the day

---

[4]"According to the [Diagnostic Manual], the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning.'"  **Hudson v. Barnhart**, 345 F.3d 661, 663 n. 2 (8th Cir. 2003).  See also **Bridges v. Massanari**, 2001 WL 883218, *5 n.1 (E.D. La. July 30, 2001) ("The GAF orders the evaluating physician to consider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." (interim quotations omitted)).

[5]A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Diagnostic Manual at 34.

[6]A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)."  Diagnostic Manual at 34 (alteration added).

before and, if she was not improved at the next visit, Dr. Nagra would consider giving her facet blocks.  (<u>Id.</u>)

On April 26 and on May 29, Plaintiff saw Dr. Ahmad.  (<u>Id.</u> at 244-45.)  At the May visit, Dr. Ahmad discontinued one medication and added another.  (<u>Id.</u> at 245.)

Plaintiff had a computed tomography ("CT") of her head in May due to complaints of headaches.  (<u>Id.</u> at 224.)  The CT scan was negative.  (<u>Id.</u>)

On June 13, she returned to Dr. Nagra.  (<u>Id.</u> at 225.)  Her constipation was better.  (<u>Id.</u>)  She was trying to lose weight and was sleeping better.  (<u>Id.</u>)  She was seeing Dr. Ahmad and reported that her treatment by him was helpful.  (<u>Id.</u>)  Also helpful was the TENS unit.  (<u>Id.</u>)  She had been out of work for three years and was thinking of going back.  (<u>Id.</u>)  Dr. Nagra concluded that she had myofascial pain.  (<u>Id.</u>)

A telephone request by Plaintiff to the FCHC for a refill of the Ultram was denied on June 18 on the grounds that she needed an appointment.  (<u>Id.</u> at 199.)  On July 3, she saw Ms. Sweeney for complaints of diarrhea four to five times a day for two weeks, of vomiting for the past two days, and of cold symptoms.  (<u>Id.</u> at 200-01.)  Ms. Sweeney opined that the diarrhea might be a side effect of the medications Plaintiff was taking and suggested that she call her psychiatrist to see if he could adjust her dosages.  (<u>Id.</u> at 201.)  She noted that Plaintiff weighed 196 pounds and had done so since September of 2000.  (<u>Id.</u>)  A referral was to be sent for a renewal of her TENS unit.  (<u>Id.</u>)  After some discussion with the health insurer, the TENS unit was renewed for one month and later renewed for another month.  (<u>Id.</u> at 202, 206.)

The same day, Plaintiff saw Dr. Ahmad.  (Id. at 246.)  She reported that she was feeling less depressed and anxious.  (Id.)  Dr. Ahmad assessed her GAF as 60.[7]  (Id.)  Her GAF score had increased to 65[8] at the next, August visit.  (Id. at 247.)

Plaintiff cancelled her September and October appointments with the FCHC.  (Id. at 206.)  Telephone requests for prescription renewals were denied on November 13 and 26 until Plaintiff kept an appointment.  (Id.)

Plaintiff did keep her September and October appointments with Dr. Ahmad.  (Id. at 248-50.)  At the September appointment, she reported feeling moderately better but was still depressed and continued to have nightmares.  (Id. at 248.)  At the first October visit, she reported that she still suffered from depression and nightmares but not from panic attacks.  (Id. at 249.)  Two weeks later, she reported that she was sleeping for a total of six hours.  (Id. at 250.)  At her November visit to Dr. Ahmad, Plaintiff stated that she was not having nightmares, but continued to be depressed about her back pain.  (Id. at 251.)  At all four visits, her GAF was 65.  (Id. at 248-51.)

Plaintiff next saw Dr. Ahmad on January 10, 2002.  (Id. at 252.)  She had fewer nightmares and was "still [a] little" depressed.  (Id.)  She was worried about financial matters.  (Id.)  Her GAF was 70.  (Id.)

---

[7]See note 6, supra.

[8]A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  Diagnostic Manual at 34 (alteration added).

The same day, Plaintiff saw a nutritionist at the FCHC after her cholesterol levels had increased. (Id. at 209.) Her height was listed as 5 feet 2½ inches; her weight was 196 pounds. (Id.) She had increased her intake of convenience foods due to her low back pain. (Id.) She was advised to, among other things, walk two days a week for twenty minutes. (Id.)

A notation from a January 24 visit to the Center reads that the trigger point injections had helped Plaintiff with her pain. (Id. at 226.) Her pain had increased in intensity, however, with the colder weather. (Id.) Six days later, Plaintiff again reported that the back pain was worse due to the weather. (Id. at 228.) During the past week, the pain had been, at its least, a three on a ten-point scale and, at its worst, a ten. (Id.) It was currently an eight. (Id.) Dr. Nagra gave her a lumbar epidural steroid injection at L3-4. (Id. at 230.) She reported that her pain was a four within five minutes of the injection being completed. (Id.) Plaintiff was to continue all medications, participate in physical therapy and a home exercise program, and return in six months. (Id. at 229, 231.) Dr. Nagra gave Plaintiff a lumbar epidural steroid injection on January 30. (Id. at 321-22.)

A February notation reads that Plaintiff's current TENS unit was not working and the insurer would not cover the electrodes for that machine. (Id. at 208.)

Plaintiff reported to Dr. Ahmad on February 7 that the epidural injections had not given her much benefit. (Id. at 253.) She was sleeping three to four hours a night. (Id.) Her GAF was 70. (Id.)

After Plaintiff reported that she continued to have low back pain, Dr. Nagra decided to give her trigger point injections and to refer her to physical therapy. (Id. at 232.) She was given the injections on February 27 and had "good pain relief within three minutes of completion of the procedure." (Id. at 233-35.) Dr. Nagra recommended that she continue to use a TENS unit to control her myofascial pain. (Id. at 233, 235.)

A notation on February 19 in the records of the FCHC and another notation on March 15 reads that Plaintiff had not yet picked up the script for a new TENS unit. (Id. at 210, 212.) It was further noted that Plaintiff needed an order for a TENS unit that would replace her current one. (Id.)

Also in February, L. Virgil Das, M.D., with FCHC, signed an authorization for Plaintiff to have disabled plates or a placard for her motor vehicle on a permanent basis. (Id. at 350.)

On April 3, Plaintiff consulted Dr. Das. (Id. at 331.) His report of that visit reads, in relevant part, as follows.

> Here for evaluation of back pain, specifically for sending information to her attorney for her Disability case. . . . I do not do the Disability evaluation, but I do a medical evaluation of her condition. She is basically able to sit for about 30 minutes at a time, stand for 30 minutes at a time, walk for 30 minutes at a time. She can occasionally lift 1 to 10 pounds. She can occasionally carry 1 to 10 pounds, but no more than that. . . . She does, probably, have a medically determinable impairment that could be expected to produce pain, but I do not have records from Dr. Nagra at BJC. Her pain is constant. She has complaints of pain but is unable to give any other subjective problems. She does have difficulty shopping, and difficulty doing day to day work. . . . She needs to lie down during the day sometimes because of back pain. She needs to take breaks every 30 minutes because of back pain. . . . Apparently her back pain is in her mid back. . . .

(Id.)  On examination, her straight leg raising was negative, her deep tendon reflexes were symmetrical, and her muscle strength was 5/5.  (Id.)  Dr. Das advised Plaintiff to continue with the therapy recommended by Dr. Nagra.  (Id.)  He was to try to obtain Dr. Nagra's records to determine the cause of Plaintiff's back pain.  (Id.)

Plaintiff saw Dr. Ahmad again on April 8.  (Id. at 254.)  Her moods were up and down; her back pain persisted.  (Id.)

On May 6, Plaintiff consulted Denise Hooks-Anderson, M.D., with the FCHC for her allergies.  (Id. at 332.)  She was prescribed medication and told to follow-up with Dr. Das if needed.  (Id.)

The next day, Plaintiff returned to Dr. Nagra.  (Id. at 237-38.)  Her pain was then an eight but had been, on the average, a three to four.  (Id. at 237.)  Plaintiff reported that the home exercise program, which she did daily, and the TENS unit both helped.  (Id.)  The Celexa helped with her depression.  (Id.)  The trigger point injections had helped for only one to two weeks.  (Id.)  Her weight was 189 pounds.  (Id. at 238.)  She was to continue taking her current medications and was also to take Zantac.  (Id.)  She was to return in six months.  (Id.)  Two days later, she telephoned about an increase in her back pain.  (Id. at 239.)  Dr. Nagra had no additional suggestions other than to use a heating pad.  (Id.)  Plaintiff said she would go to the emergency room if the pain became worse.  (Id.)

Plaintiff saw Dr. Ahmad in May and June.  (Id. at 255-56.)  At the June visit, Plaintiff reported having spasms in her back.  (Id. at 256.)  Her GAF was 60.  (Id.)

On June 19, Dr. Das noted in Plaintiff's records that an MRI had shown mild degenerative joint disease at L5-S1 and no disc herniation. (Id. at 333.) He was to discuss these findings with Plaintiff. (Id.)

In July, Plaintiff reported to Dr. Ahmad that she was still depressed and in pain. (Id. at 339.) She no longer had nightmares. (Id.) She had been told that surgery might not help her pain. (Id.) She continued to have back pain at her August visit to Dr. Ahmad. (Id. at 340.) He noted that she was to see a workers' compensation doctor. (Id.)

Plaintiff had refills of her prescriptions in August and September 2002 from the FCHC, but the next time she requested a refill of Naproxen and Soma, in April 2003, it was refused because she needed a follow-up appointment. (Id. at 336.) A few days later, she saw Dr. Hooks-Anderson. (Id. at 337.) Her prescriptions were renewed, but Plaintiff was instructed to call Dr. Nagra's office for an appointment. (Id.) Dr. Hooks-Anderson was not comfortable with keeping Plaintiff on Soma for the long term. (Id.)

In between her two filled requests for renewals of her prescription and her denied request, she saw Dr. Ahmad a monthly basis. In September 2002, she reported she had not had a panic attack for months and had less frequent mood swings. (Id. at 341.) She still had back pain. (Id.) In October, she reported that she had not been taking the Paxil and was doing fine regardless. (Id. at 342.) It was discontinued; her dosage of Tofranil was increased and her prescription for Topamax and Xanax was renewed. (Id.) She reported in November that she was still depressed and in December that she was frustrated because of

a lack of settlement on her back injury and a feeling that she would not get better, although there was some improvement in her condition.  (<u>Id.</u> at 343-44.)

When Plaintiff next saw Dr. Ahmad, she complained of chronic back pain.  (<u>Id.</u> at 345.)  She felt she was wrongfully fired.  (<u>Id.</u>)  Surgery was not recommended.  (<u>Id.</u>)  In April, she complained to him of back pain and of being badly represented by her attorney.  (<u>Id.</u> at 346.)

Several days later, Plaintiff telephoned the Center, stating that her back was hurting and her primary care physician wanted her to return to the Center for medication and physical therapy.  (<u>Id.</u> at 323.)  She was instructed that she needed to make an appointment with the new physician.  (<u>Id.</u>)

Plaintiff saw Dr. Ahmad again in May and in July.  (<u>Id.</u> at 347, 353.)  At each visit, he assessed her GAF as 65, as it had been for at least the six previous visits.  (<u>Id.</u>)  At the July visit, Plaintiff expressed her anger at a surgeon and reported that "some" depression persisted.  (<u>Id.</u> at 353.)

Between these visits to Dr. Ahmad, Plaintiff was seen at the Center.  (<u>Id.</u> at 357.)  An MRI had shown a worsening dessication at L5-S1 with an annular tear and a small herniated nucleus pulposus without any displacement of nerve roots.  (<u>Id.</u> at 357, 364.)  On July 7, she was seen at the Center by Robert A. Swarm, M.D.  (<u>Id.</u> at 358-59, 367-68.)  Her depression was described as being under control.  (<u>Id.</u> at 359, 368.)  She wanted to think about another

lumbar epidural steroid injection and was waiting for input from the neurosurgeon.[9]  (Id.)
Following an October visit to the neurology clinic, Plaintiff was referred to the neurosurgery
clinic.  (Id. at 384.)

She was seen again at the Center by Rahul Rastogi, M.D., in December 2003 and
January 2004.  (Id. at 360-65, 369-74.)  At the January visit, she was given a lumbar
transforaminal epidural steroid injection at L5-S1.  (Id. at 364-65, 373-74.)  After receiving
the injection in lumbar level right L5-S1, she declined to proceed with the left injection.  (Id.
at 364, 373.)  On discharge, she was advised to continue her medications and her home
exercise program.  (Id. at 365, 374.)  She was to rescheduled for the left injection in two
weeks.  (Id.)

Also in July, Dr. Hooks-Anderson wrote a letter for Ms. Sweeney on behalf of
Plaintiff, summarizing her treatment for her back pain, reporting that "[r]adiographs showed
degenerative disc disease complicated with paravertebral myofascial pain," and concluding
that Plaintiff was unable to keep or maintain gainful employment due to her chronic pain.
(Id. at 352.)

Plaintiff saw Dr. Ahmad in August 2003, October 2003, and January 2004.  (Id. at
354-56.)  In October, she told him she did not want Barnes, see note 9, supra, to operate on
her.  (Id. at 355.)  He wondered if she had run out of her medication.  (Id.)  She reported in
January that she was sleeping a little better.  (Id. at 356.)  Her GAF continued to be 65.  (Id.)

---

[9]She was seen in the neurology clinic at Barnes-Jewish Hospital in July and November 2003.
(Id. at 351, 375.)  Other than the record indicating whether the visit was an initial or established visit,
there is no indication of any treatment or assessment.

As noted in the records of Dr. Nagra, Plaintiff participated in physical therapy beginning on April 18, 2001.  (Id. at 258-71.)  It was noted that Plaintiff had slipped and fallen at home in 1998.  (Id. at 260.)  She had had physical therapy before, and it had helped.  (Id.)  Her back pain radiated to her feet and was a five to six on a ten-point scale when she wore a back brace.  (Id. at 269.)  The plan was for Plaintiff to participate in physical therapy sessions once a week for eight weeks and to reduce her pain by 25%.  (Id. at 271.)

Plaintiff did participate in physical therapy sessions on April 25, May 3, May 10, May 17, May 24, June 19, and June 27.  (Id. at 273-80.)  At the May 24 visit, Plaintiff was given a TENS unit and instructed on its use.  (Id. at 277.)  She was discharged after the June 17 session.  (Id. at 280.)  She continued to have back spasms and pain that was an eight on a ten-point scale.  (Id.)  She was instructed on a home exercise program and on strategies to manage her pain.  (Id.)

The ALJ also had before him several evaluations of Plaintiff's physical and mental capacities, some completed by agency consultants, others by her health care providers.

The earliest of these is a Physical Residual Functional Capacity Assessment ("PRFCA") of Plaintiff completed by a physician[10] in May 2002.  (Id. at 281-88.)  The diagnosis was degenerative disc disease.  (Id. at 281.)  This impairment resulted in Plaintiff being able to occasionally lift twenty pounds; frequently lift ten pounds; stand, walk, or sit for six hours in an eight-hour work; and to push or pull without limitations.  (Id. at 282.)  She had postural limitations of being able to only occasionally climb ladders, ropes, or scaffold

---

[10]The name of the physician is illegible.

and to crouch. (Id. at 283.) She had no manipulative, communicative, visual, or environmental limitations. (Id. at 284-86.) The consultant concluded that Plaintiff's activities of daily living, including fixing meals for her children, doing the dishes and laundry, driving, and visiting family exceeded the limitations in the PRFCA. (Id. at 286.) The consultant also took issue with a Physical Medical Source Statement ("PMSS") submitted by Dr. Das as not being supported by the record and as being contradictory. (Id. at 287.)

That PMSS was completed by Dr. Das the month before and submitted to Plaintiff's attorneys. (Id. at 291-94.) Dr. Das limited Plaintiff to sitting and standing for 30 minutes each during an eight-hour workday. (Id. at 291.) She was limited to one hour of walking. (Id.) She could carry and occasionally lift up to 10 pounds. (Id. at 292.) Dr. Das answered "Yes" in response to the question "Does the patient have a medically determinable impairment that could be expected to produce pain?" (Id. at 293.) Asked which impairment, he responded, "Unable to assess." (Id.) The pain he rated as constant. (Id.) The objective indications of pain were muscle spasm and reduced range of motion; the subjective indications were complaints. (Id.) Sleeplessness and weight loss or gain were not present. (Id.) Asked if Plaintiff should use an assistive device, he responded, "No." (Id. at 294.) Plaintiff's pain would cause her to take more than three breaks during a normal eight-hour workday. (Id.) The date of onset was June 1998. (Id.) Asked if there were medical reasons Plaintiff could not work full time, Dr. Das responded, "See attached notes." (Id.)

Also in May, Charles A. Pap, Ph.D., completed a Psychiatric Review Technique form ("PRTF") for Plaintiff. (Id. at 295-308.) He concluded that she had an affective disorder – major depression – and an anxiety-related disorder – panic disorder. (Id. at 295, 298, 300.) These disorders resulted in a mild restriction in her activities of daily living, moderate difficulties in maintaining social functioning, and mild difficulties in maintaining concentration, persistence, and pace. (Id. at 305.) There was insufficient evidence from which to assess whether the disorders resulted in any episodes of decompensation of any duration. (Id.)

Dr. Pap also completed a Mental Residual Functional Capacity Assessment of Plaintiff. (Id. at 309-12.) Of twenty listed mental activities, Plaintiff was assessed as being markedly limited in none. (Id. at 309-10.) She was assessed as being moderately limited in her ability to work in coordination with or proximity to others without being distracted by them; her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace; and her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Id.) She was either not significantly limited in the remaining seventeen activities or there was no evidence of any limitation, including in her ability to understand and remember detailed instructions; the ability to carry out detailed instructions; and the ability to interact appropriately with the general public. (Id.)

In March 2003, Dr. Ahmad completed a Mental Medical Source Statement ("MMSS") on Plaintiff's behalf. (Id. at 314-17.) He assessed Plaintiff's ability to function in seventeen

categories as markedly limited in three, moderately limited in six, and mildly limited in eight. (Id. at 314-15.) She was markedly limited in her ability to complete a normal workday without interruptions from her symptoms, in her ability to maintain regular attendance and be punctual, and in her ability to perform at a persistent pace without an unreasonable number and length of rest periods. (Id. at 315.) Also, during the past year she had had one or two episodes of decompensation that lasted at least two weeks. (Id. at 316.) Although she did not have a substantial loss in her ability to understand, remember, and carry out simple instructions, in her ability to make judgments commensurate with the functions of unskilled work, and in her ability to respond appropriately in usual work situations, she did have a substantial loss of her ability to deal with changes in a routine work situation. (Id.) Her GAF was 65 and had been so for the past year. (Id. at 317.)

The next month, Dr. Hook completed a PMSS on Plaintiff's behalf. (Id. at 318-20.) The diagnosis was myofascial pain and degenerative disc disease. (Id. at 318.) The duration of the pain was all day. (Id. at 319.) There were no objective indications of the pain, and the only subjective indication was her complaints. (Id.) The pain would require that Plaintiff lie down or take a nap during a normal eight-hour workday and would also require that she take more than three breaks during the workday. (Id.) The date of onset was April 2002. (Id. at 320.) The medical reasons why Plaintiff should not work full time were her complaints of pain with prolonged sitting or standing. (Id.)

In April 2004, Dr. Ahmad wrote Plaintiff's counsel. (Id. at 386.) The letter reads, in part:

From psychiatric point of view, [Plaintiff] is anxious, somewhat depressed, mostly worried about not having income and not able to work. Her GAF is 60 from psychiatric point of view. From physical point of view, she is quite limited. Also it will appear that under stressful situation like at work, which causes both psychological and physical demands, she may deteriorate rapidly and most likely in her current condition, she will not be able to hold the job. Her anxiety persists.

. . .

In summary, I agree with you that in spite of somewhat high appearing current GAF, she remain [sic] dysfunctional especially when it comes to holding a job that makes either psychological, emotional or physical demands on her, which in may [sic] opinion will lead quickly to deterioration further in her condition.

(Id.)

## The ALJ's Decision

In his 2004 decision, the ALJ incorporated by reference his 2003 decision. In this earlier decision, the ALJ noted that Plaintiff had filed applications in September 1999 for SSI and for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401-433, and that these applications had been denied by the Appeals Council following an adverse decision by him on May 14, 2001. (Id. at 103.) In these applications, Plaintiff had alleged a disability onset date of August 1998. (Id.)

The ALJ then summarized Plaintiff's testimony and found she had severe impairments of chronic myofascial lower back pain, mild degenerative joint disease at L5/L5[11] with no disc herniation, major depressive disorder, and a history of panic disorder. (Id. at 103-04, 105.) Her mental impairment resulted in only mild restrictions and

---

[11]This appears to be an error; the medical records place the disease at L5/S1.

difficulties.  (Id. at 105.)  Addressing the question of Plaintiff's residual functional capacity ("RFC"), the ALJ summarized in detail the medical records from Plaintiff's first visit to Ms. Sweeney to her second visit to Dr. Hooks-Anderson in April 2003.  (Id. at 106-09.)  Citing the lack of support in the treatment records, the ALJ gave little weight to Dr. Das' April 2002 evaluations of Plaintiff's RFC and to Dr. Hooks-Anderson's April 2003 evaluation.  (Id. at 108, 109.)  The ALJ further found:

> Although the claimant appears to receive medical treatment on demand, there are significant periods during which the claimant did not seek medical intervention other than seeking medication refills.  There is no evidence that the claimant sought emergency room care for complaints of back or lower extremity pain since the alleged onset of disability.  The claimant has not been hospitalized or referred for surgery.  The claimant does not take particularly strong doses of pain medication.  Significant clinical signs typically associated with chronic pain have not been consistently present on physical examination.  There is no objective evidence of muscle atrophy, bowel or bladder dysfunction, significant neurological deficits (i.e., reflex, motor, or sensory loss) or inflammatory signs (heat, redness, swelling, etc.).  Although muscle spasms are occasionally noted, they are not persistent.  The records of Dr. Nagra are much more detailed than those of FCHC in terms of setting forth specific medical examination results, and they are notable for their lack of significant abnormal findings.
>
> . . . The claimant's activities of daily living including driving, cooking, and raising two school age children are not consistent with the degree of physical limitation the claimant alleges.  Nor are they consistent with allegations of severe nonexertional pain that would significantly diminish the claimant's ability to concentrate.

(Id. at 110.)

The ALJ next addressed the issue of Plaintiff's mental impairments.

> . . . Although the treatment notes generally contain a diagnosis of panic disorder, the notes contain no specific complaints of panic-related symptoms after July 2001, with the exception of March 17, 2003, when she reported that

the attacks were controlled by medication. The treatment notes frequently reflect a denial of panic-related symptoms. Although the treatment notes reflect continued complaints of depression and being worried, these complaints were rated at only 4 or 5 on a 1-10 ten [sic] scale. The treatment notes universally indicate that the claimant was well groomed, with normal concentration and speech, logical form of thought, and no evidence of suicidal ideations or psychosis. With a few exceptions, the claimant's sleep, appetite, and energy are described as normal. Only occasionally is some motor slowness noted. The claimant has not required inpatient mental health treatment. The claimant testified that she goes shopping, reads the Bible on a regular basis, and is visited by friends. There is little evidence, other than the initial report to Dr. Ahmed [sic] and the testimony of the claimant's boy friend [sic] that she suffers from significant social isolation.

(Id. at 110-11.) The ALJ concluded that Dr. Ahmad's records indicated that Plaintiff was experiencing significant symptoms of depression and panic disorder in March 2001, but the symptoms of depression were reduced by medication by August and the symptoms of panic disorder were almost eliminated. (Id. at 111.) Dr. Ahmad's conclusions on the MMSS were not supported by the record because (a) he had indicated that Plaintiff had the significant limitations he had described since 1998 but there was no evidence that any doctor had identified any symptoms of a mental impairment prior to 2001; (b) he had assessed Plaintiff as having a GAF of 65, indicating only mild symptoms, in the same MMSS that he assessed her as having multiple marked and moderate limitations; and (c) the limitations he described in the MMSS were inconsistent with his treatment notes. (Id.) After also summarizing Dr. Pap's assessment, the ALJ concluded that Plaintiff's "abilities to think, understand, remember, communicate, concentrate, get along with other people, and handle normal stress are not seriously impaired." (Id. at 112.)

The ALJ then found that Plaintiff retained the RFC to lift twenty pounds occasionally and ten pounds frequently, to sit, stand, or walk about six hours in an eight-hour day, to frequently climb ramps and stairs, balance, kneel, and crawl, and to occasionally stoop and crouch. (Id. at 112-13.) With this RFC, Plaintiff could preform her past relevant work as a receptionist and office assistant. (Id. at 113.)

As noted above, this decision was remanded by the Appeals Council. Specifically, the ALJ was (1) to further develop and evaluate Plaintiff's mental impairment, including recontacting Dr. Ahmad to resolve the inconsistency between his assessment of the limitations placed on Plaintiff's functioning by her mental impairments and his rating of her GAF; (2) obtain updated medical records and, if such does not clearly depict Plaintiff's limitations, obtain a consultative examination; and (3) if necessary, obtain evidence from a vocational expert.

In his 2004 decision, the ALJ summarized the updated medical evidence relevant to Plaintiff's physical impairments and concluded that this evidence did not affect his earlier findings as to her physical RFC. (Id. at 22.) He then summarized the updated evidence from Dr. Ahmad, noting that in October 2003 he assessed Plaintiff's GAF as 70 although she had run out of medication. (Id.) The ALJ also rejected Dr. Ahmad's conclusions in his April 2004 report about Plaintiff's back pain and her physical RFC. (Id.) He then found as follows:

> Dr. Ahmad's April 7, 2004, statement is an admirable attempt to help his patient with her disability claim, but it is unacceptable as proof of mental disability. Consistent GAF scores of 60-70 are simply inconsistent with

mental disability. The scores and other statements recorded by Dr. Ahmad at the times of actual treatments are more credible than [the April 2004 statement], which is a revisionist, after-the-fact statement designed mainly to help the claimant with her litigation, rather than being an objective assessment of her long-term mental functioning. The claimant is calm and symptom-free whenever she appears in Dr. Ahmad's office. She has few consistent, significant signs of chronic anxiety and depression. Dr. Ahmad's suggestion that she would immediately decompensate if placed in a work setting is a bare shade more than sheer speculation. There is no evidence that that ever happened when she worked previously. The claimant stopped working in 1998 because of back pain, not because of depression. There is no documented evidence that she sought treatment for depression before July 2002.

(Id. at 23.) Additionally, Plaintiff's allegations of her impairments and their limitations were not credible. (Id.) Plaintiff, the ALJ concluded, had, at worst, only mild restrictions of activities of daily living and maintaining of social functioning, had only mild or no recorded or credible instances of deficiencies of concentration, persistence or pace, and had no episodes of decompensation. (Id. at 24.)

Plaintiff's impairments did not preclude her return to her past relevant work. (Id. at 23.) Moreover, according to the medical-vocational guidelines, even if she were found to have long-term mental limitations that would preclude her return to that work or from doing work that required more than simple, repetitive tasks, she still could perform "numerous medium/light/sedentary, unskilled jobs." (Id. at 23-24.) She was not, therefore, disabled within the meaning of the Act. (Id. at 25.)

## Legal Standards

Under the Social Security Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically

determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B) (alterations added).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520. See also **Johnson v. Barnhart**, 390 F.3d 1067, 1070 (8th Cir. 2004); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 404.1520(b). Second, the claimant must have a severe impairment. See 20 C.F.R. § 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . ." Id. (alteration added). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational

requirement.  <u>See</u> 20 C.F.R. § 404.1520(d), and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

At the fourth step in the process, the ALJ "review[s] [claimant's] residual functional capacity and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e) and 416.920(e) (alterations added).  "[RFC] is what the claimant is able to do despite limitations caused by all the claimant's impairments."  **Lowe v. Apfel**, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)) (alteration added). "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting <u>McCoy v. Schweiker</u>, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)) (alteration added).  Moreover, "[RFC] is a determination based upon all the record evidence[,]" not only medical evidence.  **Dykes v. Apfel**, 223 F.3d 865, 866-67 (8th Cir. 2000) (alterations added).  Some medical evidence must be included in the record to support an ALJ's RFC holding.  **Id.** at 867.  "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record.  '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the

ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting Frankl v. Shalala, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Ramirez**, 292 F.3d at 580-81; **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "(1) a claimant's daily activities, (2) the duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of medication, and (5) residual functions." **Ramirez**, 292 F.3d at 581 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted)). Although an ALJ may not disregard subjective complaints of pain based only on a lack of objective medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary." Id. See also **McKinney v. Apfel**, 228 F.3d 860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical evidence regarding a claimant's disability is inconsistent."). After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

The burden at step four remains with the claimant. See **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001); **Singh**, 222 F.3d at 451. "It is the claimant's burden, and not

the Social Security Commissioner's burden, to prove the claimant's RFC." **Pearsall**, 274 F.3d at 1217.

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks**, 258 F.3d at 824. See also 20 C.F.R. § 404.1520(f). The Commissioner may meet his burden by referring to the medical-vocational guidelines (the "Grid") or by eliciting testimony by a vocational expert. **Pearsall**, 274 F.3d at 1219. The Grid may not be relied on if the claimant suffers from non-exertional impairments unless those impairments "do not diminish or significantly limit the claimant's [RFC] to perform the full range of Guideline-listed activities[.]" **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005) (alterations added; interim quotations omitted).

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court if it is supported by "substantial evidence on the record as a whole." **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998); **Frankl**, 47 F.3d at 937. "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision." **Strongson v. Barnhart**, 361 F.3d 1066, 1069-70 (8th Cir. 2004) (interim quotations omitted). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must also take into account

whatever in the record fairly detracts from that decision. **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998). The Court may not reverse that decision merely substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it "might have decided the case differently." **Strongson**, 361 F.3d at 1070. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 244 F.3d 891, 894-95 (8th Cir. 2000) (alteration added). "Ultimately, this Court will disturb the ALJ's decision only if it falls outside the available 'zone of choice.'" **Hacker v. Barnhart**, 459 F.3d 934, 936 (8th Cir. 2007).

## Discussion

Plaintiff argues that the ALJ's decision is not supported by substantial evidence on the record as a whole because he (a) improperly assessed her RFC; (b) improperly assessed her credibility; and (c) improperly (i) failed to engage in a function-by-function analysis of her past relevant work and (ii) relied on the Grid as an alternative to her past relevant work. The Commissioner disagrees.

Plaintiff's RFC. Plaintiff first contends that the ALJ erroneously assessed her RFC because he failed to give the proper weight to the opinions of Drs. Ahmad, Das, and Hooks-Anderson and to the observations of Ms. Sweeney.

Dr. Ahmad was Plaintiff's treating psychiatrist; Drs. Das, and Hooks-Anderson were Plaintiff's treating physicians. If their respective assessments of Plaintiff's RFC were

controlling, she would be disabled. "'Although a treating physician's opinion is generally entitled to substantial weight, [however,] such opinion does not automatically control, since the record must be evaluated as a whole.'" **Wilson v. Apfel**, 172 F.3d 539, 542 (8th Cir. 1999) (quoting <u>Cruze v. Chater</u>, 85 F.3d 1320, 1324-25 (8th Cir. 1996)) (alteration added). Additionally, a treating physician's opinion must be supported by medically acceptable clinical or diagnostic data. **Chamberlain v. Shalala**, 47 F.3d 1489, 1494 (8th Cir. 1995). <u>Accord</u> **Holmstrom v. Massanari**, 270 F.3d 715, 720 (8th Cir. 2001); **Prosch v. Apfel**, 201 F.3d 1010, 1012-13 (8th Cir. 2000). Thus, "[t]he weight given a treating physician's opinion is limited if the opinion consists only of conclusory statements." **Chamberlain**, 47 F.3d at 1494 (alteration added). <u>See also</u> **Piepgras v. Chater**, 76 F.3d 233, 235 (8th Cir. 1996) ("A treating physician's opinion deserves no greater respect than any other physician's opinion when the treating physician's opinion consists of nothing more than vague, conclusory statements.").

The record as a whole does not support Dr. Ahmad's MMSS describing Plaintiff as being markedly limited in three functional categories and moderately limited in six and as experiencing one or two episodes of decompensation in the past year. As noted by the ALJ, although Plaintiff's complaints to him of a physical impairment, back pain, were never absent from long, Dr. Ahmad was not treating her for her physical impairments. As to the mental impairments, Plaintiff informed him in September 2002 that she had not had a panic attack for months, although she had not been taking Paxil (prescribed for the treatment of panic disorders), nor did the panic attacks resume after the Paxil was discontinued. In July 2003,

she reported having "some" depression. During this period and during her later visits in the fall of 2003 and the winter of 2004, Dr. Ahmad assessed her GAF at 65, reflecting some mild symptoms or some difficulty in functioning, "but generally functioning pretty well." Diagnostic Manual at 34. This GAF was consistent with Dr. Ahmad's contemporaneous treatment notes but not with his MMSS. Asked by Plaintiff's attorney to resolve this conflict, Dr. Ahmad explained it one year later by referring to her physical impairments and not by any reference to the impairments, mental, for which he was treating her. This omission is consistent with his treatment records of that year in which the only psychological difficulty mentioned by Plaintiff to Dr. Ahmad was some depression; the focus of her visits was on her physical and financial problems.

Dr. Das' assessment of Plaintiff's physical RFC is also not entitled to controlling weight. It is clear from his April 2002 statement that he was relying on Plaintiff's subjective complaints for his conclusions. See **Charles v. Barnhart**, 375 F.3d 777, 784 (8th Cir. 2004) ("A treating physician's opinion deserves no greater respect than any other physician's opinion when the treating physician's opinion consists of nothing more than vague, conclusory statements."); **Brown v. Chater**, 87 F.3d 963, 964 (8th Cir. 1996) (permitting ALJ to discount health care provider's statement as to claimant's limitations because such conclusion apparently rested solely on claimant's complaints); **Woolf v. Shalala**, 3 F.3d 1210, 1214 (8th Cir. 1993) (finding that ALJ could discount conclusory statement of disability based on claimant's subjective complaints). Indeed, there is no evidence that he had examined Plaintiff before completing his assessment and the only earlier record of Dr.

Das is of his completing the form for her to obtain a disabled parking placard. In his April 2002 notes, he reported that Plaintiff was seeing him for a disability evaluation and that she "probably" had a medically determinable impairment that could be expected to produce pain but he could not say so without reviewing Dr. Nagra's records. Had he had access to those records, he would have placed her pain in her lower back, where Plaintiff continually reported it as being, rather than in her middle back, as he reported. Moreover, he listed June 1998 as the date of onset although he would not treat her for several years after that.

Plaintiff also takes issue with the weight given by the ALJ to Dr. Hooks-Anderson's two statements. The first was completed by the doctor on behalf the family nurse practitioner, Ms. Sweeney. At that point, Dr. Hooks-Anderson had seen Plaintiff once for allergies and once because Plaintiff had to have an appointment before her medication prescriptions would be refilled. At this appointment, Plaintiff was instructed to follow-up with Dr. Nagra. Clearly, Dr. Hooks-Anderson's conclusion that Plaintiff was unable to keep or maintain employment due to chronic pain was not based on medically acceptable data but on Plaintiff's own descriptions of her limitations. And, the PMSS completed by Dr. Hooks-Anderson in April 2003 was explicitly based on those descriptions.

Similarly, the ALJ did not err by not giving greater weight to the opinions of Ms. Sweeney as expressed by Dr. Hooks-Anderson. The opinion, whether the doctor's or the nurse practitioner's, that Plaintiff could not maintain employment is based on Plaintiff's subjective complaints and not on any objective data. Moreover, a health care provider's "opinion that a claimant is not able to return to work 'involves an issue reserved for the

Commissioner and therefore is not the type of "medical opinion" to which the Commissioner gives controlling weight.'" **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005) (quoting Ellis, 392 F.3d at 994)). The few observations by Ms. Sweeney of Plaintiff when examining her for her back pain do not support the description of disabling pain.

Plaintiff's Credibility. Plaintiff also takes issue with the ALJ's assessment of her credibility. Plaintiff correctly notes that in his 2004 decision the ALJ did not engage in a detailed analysis of her credibility according to the guidelines established in Polaski, supra. The Commissioner correctly notes, however, that the ALJ did engage in the analysis in his 2003 decision and incorporated that decision in his 2004 decision.

The Court does agree with Plaintiff that her activities of daily living, i.e., limited chores, limited driving, limited socializing, and reading without always concentrating, are not inconsistent with her allegations of disabling impairments. "[The Eighth Circuit Court of Appeals] has repeatedly observed that the ability to do activities such as light housework and visiting with friends provides little or no support for the finding that a claimant can perform full-time competitive work." **Burress v. Apfel**, 141 F.3d 875, 881 (8th Cir. 1998) (interim quotations omitted). The other factors found by the ALJ in his 2003 decision do support his credibility determination, e.g., the extended periods during which Plaintiff did not seek medical treatment, see **Chamberlain**, 47 F.3d at 1495, the period during which she did not pick up the script for the TENS unit, the lack of supporting objective medical evidence for the degree of alleged pain, and inconsistencies in the record, including the discrepancy between her alleged onset date and the first date she sought medical attention.

Also relevant, but not dispositive, was the consideration that Plaintiff's prospective disability benefits would surpass all her earnings.  See **Ramirez**, 292 F.3d at 581.  See also **Frederickson v. Barnhart**, 359 F.3d 972, 976 (8th Cir. 2004) (a claimant's poor work history is relevant when assessing her credibility).  Her lack of earnings and employment preceded her alleged disability onset date.

And, regardless of whether Plaintiff's daily activities could be construed as supporting Plaintiff's claims, "[t]he ALJ [is] not obligated to accept all of [Plaintiff's] assertions concerning those limitations."  **Ostronski v. Chater**, 94 F.3d 413, 418 (8th Cir. 1996) (alterations added).  See also **Choate v. Barnhart**, 457 F.3d 865, 871 (8th Cir. 2006) (affirming ALJ's negative assessment of claimant's credibility; claimant's "self-reported limitations" on daily activities were inconsistent with medical record).

Function-By-Function Analysis.  Plaintiff and the Commissioner next disagree about whether the ALJ engaged in a proper function-by-function analysis of her past relevant work and about whether, in the alternative, he properly relied on the Grid.  Because, for the reasons set forth below, the Court finds no error in the reliance on the Grid, the Court declines to reach the issue whether the ALJ properly analyzed her past relevant work.

As noted above, the Commissioner may not rely on the Grid at step five if a claimant is limited by a nonexertional impairment.  See **Baker v. Barnhart**, 457 F.3d 882, 894-95 (8th Cir. 2006); **Holley v. Massanari**, 253 F.3d 1088, 1093 (8th Cir. 2001).  Pain and depression are nonexertional impairments.  **Baker**, 457 F3d at 894; **Beckley**, 152 F.3d at

1060; **Lucy v. Chater**, 113 F.3d 905, 909 (8th Cir. 1997). Nonexertional limitations "affect

an individual's ability to meet the nonstrength demands of jobs," Social Security Ruling 96-

4p, 1996 WL 374187, *1 (1996), "that is, demands other than sitting, standing, walking,

lifting, carrying, pushing or pulling," 20 C.F.R. § 404.1569a(a). "Non-exertional

impairments that 'do[ ] not diminish or significantly limit the claimant's residual functional

capacity to perform the full range of Guideline-listed activities' do not prevent the use of the

grids, however." **Ellis**, 392 F.3d at 997 (quoting Shannon v. Chater, 54 F.3d 484, 488 (8th

Cir. 2005)) (alteration in original).

In the instant case, the ALJ found that Plaintiff's nonexertional limitations did not

diminish her residual functional capacity to lift twenty pounds occasionally and ten pounds

frequently; to sit, stand, or walk about six hours in an eight-hour day; to frequently climb

ramps and stairs; to balance, kneel, and crawl; and to occasionally stoop and crouch. "Even

though the RFC assessment draws from medical sources for support, it is ultimately an

administrative determination reserved to the Commissioner." **Cox v. Astrue**, 495 F.3d 614,

620 (8th Cir. 2007). The ALJ's RFC assessment is supported by substantial evidence on the

record as a whole.

Additionally, as noted by the Commissioner, if a person can stoop occasionally in

order to lift objects, "the sedentary and light occupational base is virtually intact." Social

Security Ruling 85-15, 1985 WL 56857, *7 (S.S.R. Nov. 30, 1984). "Light work involves

lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing

up to 10 pounds." 20 C.F.R. § 404.1567(b). This is consistent with the ALJ's determination

of Plaintiff's RFC.  The Grid, Rule 202.20, 20 C.F.R. Pt. 404, Subpt. P, Appx. 2, directs a finding of not disabled for a person of Plaintiff's age, education, and RFC.

"'[W]hen a claimant's subjective complaints of pain are explicitly discredited for legally sufficient reasons articulated by the ALJ, [as in the instant case,] the [Commissioner's] burden [at the fifth step] may be met by use of the [Medical-Vocational Guidelines].'"  **Baker**, 457 F.3d at 894-95 (quoting <u>Naber v. Shalala</u>, 22 F.3d 186, 189-90 (8th Cir. 1994)) (first three alterations added).  Plaintiff's credibility was discredited by the ALJ for articulate, legally sufficient reasons.  Therefore, the ALJ did not err in not relying on the Grid and did not err in concluding that Plaintiff was not disabled within the meaning of the Act.

## <u>Conclusion</u>

The question is not how this Court would decide whether Plaintiff is disabled within the meaning of the Act, but is whether the ALJ's decision that she is not is supported by substantial evidence in the record as a whole, including a consideration of the evidence that detracts from the ALJ's decision.  For the reasons discussed above, there is such evidence.  Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and that this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.


<u>/s/ Thomas C. Mummert, III</u>

THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this <u>3rd</u> day of March, 2008.